SAMPSON, ADMINISTRATOR, GENERAL SERV-
ICES ADMINISTRATION, ET AL. *v.* MURRAY

No. 72–403.  Argued November 14, 1973—
Decided February 19, 1974

62

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Blackmun, and Powell, JJ., joined. Douglas, J., filed a dissenting opinion, *post*, p. 92. Marshall, J., filed a dissenting opinion, in which Brennan, J., joined, *post*, p. 97.

*Keith A. Jones* argued the cause for petitioners. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Wood, Acting Assistant Attorney General Jaffe, Samuel Huntington,* and *Walter H. Fleischer.*

*Thomas J. McGrew* argued the cause for respondent *pro hac vice.* With him on the brief was *James A. Dobkin.*

Mr. Justice Rehnquist delivered the opinion of the Court.

Respondent is a probationary employee in the Public Buildings Service of the General Services Administration (GSA). In May 1971, approximately four months

after her employment with GSA began, she was advised in writing by the Acting Commissioner of the Public Buildings Service, W. H. Sanders, that she would be discharged from her position on May 29, 1971. She then filed this action in the United States District Court for the District of Columbia, seeking to temporarily enjoin her dismissal pending her pursuit of an administrative appeal to the Civil Service Commission. The District Court granted a temporary restraining order, and after an adversary hearing extended the interim injunctive relief in favor of respondent until the Acting Commissioner of the Public Buildings Service testified about the reasons for respondent's dismissal.

A divided Court of Appeals for the District of Columbia Circuit affirmed,[1] rejecting the Government's contention that the District Court had no authority whatever to grant temporary injunctive relief in this class of cases, and holding that the relief granted by the District Court in this particular case was within the permissible bounds of its discretion. We granted certiorari, *sub nom. Kunzig* v. *Murray,* 410 U. S. 981 (1973). We agree with the Court of Appeals that the District Court is not totally without authority to grant interim injunctive relief to a discharged Government employee, but conclude that, judged by the standards which we hold must govern the issuance of such relief, the issuance of the temporary injunctive relief by the District Court in this case cannot be sustained.

I

Respondent was hired as a program analyst by the Public Buildings Service after previous employment in the Defense Intelligence Agency. Under the regulations

---

[1] *Murray* v. *Kunzig,* 149 U. S. App. D. C. 256, 462 F. 2d 871 (1972). For a discussion of the Court of Appeals' jurisdiction, and the jurisdiction of this Court, see *infra,* at 86–88.

of the Civil Service Commission, this career conditional appointment was subject to a one-year probationary period.[2] Applicable regulations provided that respondent, during this initial term of probation, could be dismissed without being afforded the greater procedural advantages available to permanent employees in the competitive service.[3] The underlying dispute between the parties arises over whether the more limited procedural requirements applicable to probationary employees were satisfied by petitioners in this case.

The procedural protections which the regulations accord to most dismissed probationary employees are limited. Commonly a Government agency may dismiss a probationary employee found unqualified for continued employment simply "by notifying him in writing as to why he is being separated and the effective date of the action."[4] More elaborate procedures are specified when the ground for terminating a probationary employee is "for conditions arising before appointment."[5] In such cases the regulations require that the employee receive "an advance written notice stating the reasons, specifically and in detail, for the proposed action"; that the employee be given an opportunity to respond in writing and to furnish affidavits in support of his response; that the agency "consider" any answer filed by the employee in reaching its decision; and that the employee be notified of the agency's decision at the earliest practicable date.[6] Respondent contends that her termina-

---

[2] 5 CFR § 315.801.

[3] Compare 5 CFR §§ 315.801–315.807 with 5 CFR § 752.101 *et seq.*

[4] 5 CFR § 315.804.

[5] 5 CFR § 315.805.

[6] Section 315.805 reads in full:

"§ 315.805 Termination of probationers for conditions arising before appointment.

"When an agency proposes to terminate an employee serving a

tion was based in part on her activities while in the course of her previous employment in the Defense Intelligence Agency, and that therefore she was entitled to an opportunity to file an answer under this latter provision.

The letter which respondent received from the Acting Commissioner, notifying her of the date of her discharge, stated that the reason for her discharge was her "complete unwillingness to follow office procedure and to accept direction from [her] supervisors." After receipt of the letter, respondent's counsel met with a GSA personnel officer to discuss her situation and, in the course of the meeting, was shown a memorandum prepared by an officer of the Public Buildings Service upon which Sanders apparently based his decision to terminate respondent's employment. The memorandum contained both a discussion of respondent's conduct in her job with the Public Buildings Service and a discussion of her conduct during her previous employment at the Defense

probationary or trial period for reasons based in whole or in part on conditions arising before his appointment, the employee is entitled to the following:

"(a) *Notice of proposed adverse action.* The employee is entitled to an advance written notice stating the reasons, specifically and in detail, for the proposed action.

"(b) *Employee's answer.* The employee is entitled to a reasonable time for filing a written answer to the notice of proposed adverse action and for furnishing affidavits in support of his answer. If the employee answers, the agency shall consider the answer in reaching its decision.

"(c) *Notice of adverse decision.* The employee is entitled to be notified of the agency's decision at the earliest practicable date. The agency shall deliver the decision to the employee at or before the time the action will be made effective. The notice shall be in writing, inform the employee of the reasons for the action, inform the employee of his right of appeal to the appropriate office of the Commission, and inform him of the time limit within which the appeal must be submitted as provided in § 315.806 (d)."

Intelligence Agency. Relying upon the inclusion of the information concerning her previous employment, respondent's counsel requested that she be given a detailed statement of the charges against her and an opportunity to reply—the procedures to which she would be entitled under the regulations if in fact the basis of her discharge had been conduct during her previous employment. This request was denied.

Respondent then filed an administrative appeal with the Civil Service Commission pursuant to the provisions of 5 CFR § 315.806 (c), alleging that her termination was subject to § 315.805 and was not effected in accordance with the procedural requirements of that section.[7] While her administrative appeal was pending undecided, she filed this action. Her complaint alleged that the agency had failed to follow the appropriate Civil Service regulations, alleged that her prospective discharge would deprive her of income and cause her to suffer the embarrassment of being wrongfully discharged, and requested a temporary restraining order and interim injunctive relief against her removal from employment pending agency determination of her appeal. The District Court granted the temporary restraining order at the time of the filing of respondent's complaint, and set a hearing on the application for a temporary injunction for the following week.

At the hearing on the temporary injunction, the District Court expressed its desire to hear the testimony of Sanders in person, and refused to resolve the controversy on the basis of his affidavit which the Government offered to furnish. When the Government declined

---

[7] Section 315.806 (c) reads:

"A probationer whose termination is subject to § 315.805 may appeal on the ground that his termination was not effected in accordance with the procedural requirements of that section."

to produce Sanders, the court ordered the temporary injunctive relief continued, stating that "Plaintiff may suffer immediate and irreparable injury, loss and damage before the Civil Service Commission can consider Plaintiff's claim." [8] The Government, desiring to test the authority of the District Court to enter such an order, has not produced Sanders, and the interim relief awarded respondent continues in effect at this time.

On the Government's appeal to the Court of Appeals for the District of Columbia Circuit, the order of the District Court was affirmed. Although recognizing that "Congress presumably could remove the jurisdiction of the District Courts to grant such equitable interim relief, in light of the remedies available," [9] the court found that the District Court had the power to grant relief in the absence of an explicit prohibition from Congress. The Court of Appeals decided that the District Court acted within the bounds of permissible discretion in requiring Sanders to appear and testify,[10] and in continuing the temporary injunctive relief until he was produced as a witness by the Government.

---

[8] The order of the District Court stated in full:

"It appearing to the Court from the affidavits and accompanying exhibits that a Temporary Restraining Order, pending the appearance before this Court of Mr. W. H. Sanders, Acting Commissioner, Public Buildings Service, should issue because, unless Defendants are restrained from terminating Plaintiff's employment, Plaintiff may suffer immediate and irreparable injury, loss and damage before the Civil Service Commission can consider Plaintiff's claim,

"NOW, THEREFORE, IT IS ORDERED, that the Temporary Restraining Order issued by this Court at twelve o'clock p. m., May 28, 1971, is continued until the appearance of the aforesaid W. H. Sanders.

"IT IS FURTHER ORDERED that a copy of this Order be served by the United States Marshal on Defendants forthwith."

[9] 149 U. S. App. D. C., at 262 n. 21, 462 F. 2d, at 877 n. 21.

[10] Id., at 263–264, 462 F. 2d, at 878–879.

## II

While it would doubtless be intellectually neater to completely separate the question whether a District Court has authority to issue any temporary injunctive relief at the behest of a discharged Government employee from the question whether the relief granted in this case was proper, we do not believe the questions may be thus bifurcated into two watertight compartments. We believe the basis for our decision can best be illuminated by taking up the various arguments which the parties urge upon us.

Petitioners point out, and the Court of Appeals below apparently recognized, that Congress has given the District Courts no express statutory authorization to issue temporary "stays" in Civil Service cases. Although Congress has often specifically conferred such authority when it so desired—for example, in the enabling statutes establishing the NLRB,[11] the FTC,[12] the FPC,[13] and the SEC[14]—the statutes governing the Civil Service Commission are silent on the question.[15] The rules and regu-

---

[11] 29 U. S. C. §§ 160 (j), (l).

[12] 15 U. S. C. § 53 (a).

[13] 16 U. S. C. § 825m (a).

[14] 15 U. S. C. §§ 77t (b), 78u (e).

[15] Respondent does suggest that 5 U. S. C. § 705 may confer authority to grant relief in this case. That section reads:

"When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."

The relevant legislative history of that section, however, indicates

lations promulgated pursuant to a broad grant of statutory authority likewise make no provision for interlocutory judicial intervention.

The Court of Appeals nevertheless found that the district courts had traditional power to grant stays in such personnel cases. Commenting upon the Government's arguments for reversal below, the court stated:

> "It is asserted that the Civil Service Commission has been given exclusive review jurisdiction. But, as noted initially, there is no statutory power in the Civil Service Commission to grant a temporary stay of discharge. Prior to the Civil Service Act a United States District Court would certainly have had jurisdiction and power to grant such temporary relief. The statute did not explicitly take it away, nor implicitly by conferring such jurisdiction and power on the CSC; we hold the District Court still has jurisdiction and may exercise the power under established standards in appropriate circumstances." [16]

If the issue were to turn solely on the earlier decisions of this Court examining the authority of federal courts to intervene in disputes about governmental employment, we think this assumption of the Court of Appeals is wrong. In *Keim* v. *United States*, 177 U. S. 290 (1900), this Court held that the Court of Claims had no authority to award damages to an employee who claimed he

---

that it was primarily intended to reflect existing law under the *Scripps-Howard* doctrine, discussed *infra*, and not to fashion new rules of intervention for District Courts. See S. Rep. No. 752, 79th Cong., 1st Sess., 27, 44 (1945). Thus respondent's various contentions may be grouped under her primary theory discussed in the text.

[16] 149 U. S. App. D. C., at 265, 462 F. 2d, at 880 (footnotes omitted).

had been wrongfully discharged by his federal employer.[17] In *White* v. *Berry*, 171 U. S. 366 (1898), a Government employee had sought to enjoin his employer from dismissing him from office, alleging that the removal would violate both the Civil Service Act and the applicable regulations.[18] The Circuit Court assumed jurisdiction and issued an order prohibiting the defendant from inter-

---

[17] The Court there expressed the traditional judicial deference to administrative processes in the following terms:

"The appointment to an official position in the Government, even if it be simply a clerical position, is not a mere ministerial act, but one involving the exercise of judgment. The appointing power must determine the fitness of the applicant; whether or not he is the proper one to discharge the duties of the position. Therefore it is one of those acts over which the courts have no general supervising power.

"In the absence of specific provision to the contrary, the power of removal from office is incident to the power of appointment. 'It cannot for a moment be admitted that it was the intention of the Constitution that those offices which are denominated inferior offices should be held during life. And if removable at pleasure, by whom is such removal to be made? In the absence of all constitutional provision or statutory regulation it would seem to be a sound and necessary rule to consider the power of removal as incident to the power of appointment.' *In re Hennen*, 13 Pet. 230, 259; *Parsons* v. *United States*, 167 U. S. 324. Unless, therefore, there be some specific provision to the contrary, the action of the Secretary of the Interior in removing the petitioner from office on account of inefficiency is beyond review in the courts either by mandamus to reinstate him or by compelling payment of salary as though he had not been removed." 177 U. S., at 293–294.

[18] The plaintiff in *White* protested that he was being discharged because of his political affiliation, a basis for discharge specifically prohibited under the Civil Service rules. 171 U. S., at 367–368. Such a contention obviously went to the heart of the Civil Service legislation, since a primary purpose of that system was to remove large sectors of Government employment from the political "spoils system" which had previously played a large part in the selection and discharge of Government employees. See generally H. Kaplan, The Law of Civil Service 1–22 (1958).

fering with the plaintiff's discharge of his duty " 'until he shall be removed therefrom by proper proceedings had under the Civil Service Act and the rules and regulations made thereunder or by judicial proceedings at law . . . .' " [19] This Court reversed. Discussing the apparently well-established principle that " 'a court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee,' " [20] the Court held that "the Circuit Court, sitting in equity, was without jurisdiction to grant the relief asked." [21]

Respondent's case, then, must succeed, if at all, despite earlier established principles regarding equitable intervention in disputes over tenure of governmental employees, and not because of them. Much water has flowed over the dam since 1898, and cases such as *Service v. Dulles,* 354 U. S. 363 (1957), cited by the District Court in its memorandum opinion in this case, establish that federal courts do have authority to review the claim of a discharged governmental employee that the agency effectuating the discharge has not followed administrative regulations.[22] In that case, however, judicial pro-

---

[19] 171 U. S., at 374–375.

[20] The Court quoted from *Morgan* v. *Nunn,* 84 F. 551 (CCMD Tenn. 1898), and noted that "[s]imilar decisions have been made in other Circuit Courts of the United States." 171 U. S., at 377–378.

[21] *Id.,* at 378.

[22] In *Service* an employee discharged under the provisions of the McCarran Rider, 65 Stat. 581, contended that the Secretary of State had not followed departmental regulations in effecting his dismissal. This Court agreed with plaintiff's position and decided that his "dismissal cannot stand." 354 U. S., at 388. However, the employee in that case had made a full effort to secure administrative review of his discharge prior to filing suit in the District Court. These efforts, as the Court noted, *id.,* at 370, had "proved unsuccessful." In the present case respondent has petitioned the court before ascertaining whether administrative relief will be granted.

ceedings were not commenced until the administrative remedy had been unsuccessfully pursued.[23]   The fact that Government personnel decisions are now ultimately subject to the type of judicial review sought in *Service* v. *Dulles, supra,* does not, without more, create the authority to issue interim injunctive relief which was held lacking in cases such as *White* v. *Berry, supra.*

The Court of Appeals found support for its affirmance of the District Court's grant of injunctive relief in *Scripps-Howard Radio* v. *FCC,* 316 U. S. 4 (1942). In *Scripps-Howard* the licensee of a Cincinnati radio station petitioned the FCC to vacate an order permitting a Columbus radio station to change its frequency and to increase its broadcasting power.   The licensee also requested a hearing.   When the Commission denied the petition, the licensee filed a statutory appeal in the Court of Appeals for the District of Columbia and, in conjunction with the docketing of the appeal, asked the court to stay the FCC order pending its decision.   The Court of Appeals, apparently departing from a longstanding policy of issuing such stays,[24] declined to do so in this case and ultimately certified the question of its power to this Court.[25]

---

[23] See n. 22, *supra.*

[24] The Court pointed out that "even though the Radio Act of 1927 contained no provisions dealing with the authority for the Court of Appeals for the District of Columbia to stay orders of the Commission on appeal, the Court had been issuing stays as a matter of course wherever they were found to be appropriate, without objection by the Commission." *Scripps-Howard Radio* v. *FCC,* 316 U. S. 4, 13 (1942).

[25] The precise question certified was:

" 'Where, pursuant to the provisions of Section 402 (b) of the Communications Act of 1934, an appeal has been taken, to the United States Court of Appeals, from an order of the Federal Communications Commission, does the court, in order to preserve the status quo pending appeal, have power to stay the execution of the

This Court held that the Court of Appeals had power to issue the stay, analogizing it to the traditional stay granted by an appellate court pending review of an inferior court's decision:

> "It has always been held, therefore, that as part of its traditional equipment for the administration of justice,[*] a federal court can stay the enforcement of a judgment pending the outcome of an appeal." [26]

But in *Scripps-Howard* the losing party before the agency sought an interim stay of final agency action pending statutory judicial review.[27] A long progression of cases in this Court had established the authority of a court, empowered by statute to exercise appellate jurisdiction, to issue appropriate writs in aid of that jurisdiction.[28] The All Writs Act, first enacted as a part of the Judiciary Act of 1789, provided statutory confirmation of this

Commission's order from which the appeal was taken, pending the determination of the appeal?' " *Id.*, at 6.

The wording of the question certified makes clear that the Court was faced only with the situation in which an appeal has been filed seeking review of completed agency action.

[26] *Id.*, at 9–10. In the Court's opinion a footnote, herein designated with an asterisk, referred to the All Writs Act, 28 U. S. C. § 1651 (a), which reads:

"The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

The reliance of the Court on this provision was noted by the Court of Appeals in its opinion in this case. 149 U. S. App. D. C., at 261 n. 17, 462 F. 2d, at 876 n. 17.

[27] See n. 25, *supra.*

[28] For example, the two cases cited by the Court in *Scripps-Howard* involved situations in which a court accepted appeal jurisdiction and, in connection with that acceptance, issued a stay of the decision below. See *In re Claasen,* 140 U. S. 200 (1891) (writ of error to this Court); *In re McKenzie,* 180 U. S. 536 (1901) (appeal taken to the Circuit Court of Appeals). The All Writs Act, n. 26, *supra,* provided the authority in each case.

authority.[29]   This Court in *Scripps-Howard* held that the same principles governed the authority of courts charged by statute with judicial review of agency decisions, and that the authority to grant a stay exists in such a court even though not expressly conferred by the statute which confers appellate jurisdiction.

*Scripps-Howard, supra,* of course, is not the instant case.   The authority of the District Court to review agency action under *Service* v. *Dulles, supra,* does not come into play until it may be authoritatively said that the administrative decision to discharge an employee does in fact fail to conform to applicable regulations.[30] Until administrative action has become final, no court is in a position to say that such action did or did not conform to applicable regulations.   Here respondent had obtained no administrative determination of her appeal at the time she brought the action in the District Court. She was in effect asking that court to grant her, on an interim basis, relief which the administrative agency charged with review of her employer's action could grant her only after it had made a determination on the merits.

While both the District Court and the Court of Appeals characterized the District Court's intervention as a "stay," the mandatory retention of respondent in the position from which she was dismissed actually served to provide the most extensive relief which she might conceivably obtain from the agency after its review on the merits.   It may well be that the Civil Service Commission, should it have agreed with respondent's version of the basis for her dismissal, would prohibit the final

---

[29] See n. 26, *supra.*

[30] See n. 22, *supra.*   As noted above, the employee in *Service* sought to have the Secretary's action declared invalid within the administrative system.   He sought judicial relief only after it became evident that no administrative relief would be forthcoming.

separation of respondent unless and until proper procedures had been followed. But this is not to say that it would hold respondent to be entitled to full reinstatement with the attendant tension with her superiors that the agency intended to avoid by dismissing her. Congress has provided that a wrongfully dismissed employee shall receive full payment and benefits for any time during which the employee was wrongfully discharged from employment.[31] The Civil Service Commission could conceivably accommodate the conflicting claims in this case by directing respondent's superiors to provide her with an opportunity to reply by affidavit, and by ordering that she receive backpay for any period of her dismissal prior to the completion of the type of dismissal procedure required by the regulations.

The Court in *Scripps-Howard* recognized that certain forms of equitable relief could not properly be granted by federal courts. The Court specifically contrasted the stay of a license grant and the stay of a license denial, finding that the latter would have no effect:

"Of course, no court can grant an applicant an authorization which the Commission has refused.

---

[31] The Back Pay Act is found at 5 U. S. C. § 5596. The pertinent provisions read:

"(b) An employee of an agency who, on the basis of an administrative determination or a timely appeal, is found by appropriate authority under applicable law or regulation to have undergone an unjustified or unwarranted personnel action that has resulted in the withdrawal or reduction of all or a part of the pay, allowances, or differentials of the employee—

"(1) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect an amount equal to all or any part of the pay, allowances, or differentials, as applicable, that the employee normally would have earned during that period if the personnel action had not occurred, less any amounts earned by him through other employment during that period . . . ."

> No order that the Court of Appeals could make would enable an applicant to go on the air when the Commission has denied him a license to do so. A stay of an order denying an application would in the nature of things stay nothing. It could not operate as an affirmative authorization of that which the Commission has refused to authorize." [32]

Surely that conclusion would not vary depending upon whether the radio station had started broadcasting on its own initiative and sought to stay a Commission order directing it to cease. Yet here the District Court did authorize, on an interim basis, relief which the Civil Service Commission had neither considered nor authorized—the mandatory reinstatement of respondent in her Government position. We are satisfied that *Scripps-Howard*, involving as it did the traditional authority of reviewing courts to grant stays, provides scant support for the injunction issued here.

The Court of Appeals also relied upon *FTC v. Dean Foods Co.*, 384 U. S. 597 (1966), in reaching its decision. There a closely divided Court held that a Court of Appeals having ultimate jurisdiction to review orders of the Federal Trade Commission might, upon the Commission's application,[33] grant a

---

[32] 316 U. S., at 14.

[33] A preliminary question of importance in *Dean Foods* was whether the Commission, in the absence of express statutory authorization, could petition the Court of Appeals for preliminary relief. This Court said:

"[T]he Commission is a governmental agency to which Congress has entrusted, *inter alia*, the enforcement of the Clayton Act, granting it the power to order divestiture in appropriate cases. At the same time, Congress has given the courts of appeals jurisdiction to review final Commission action. It would stultify congressional purpose to say that the Commission did not have the incidental

temporary injunction to preserve the controversy before the agency. The Commission's application alleged,[34] and the court accepted,[35] that refusal to grant the injunction would result in the practical disappearance of one of the entities whose merger the Commission sought to challenge. The disappearance, in turn, would mean that the agency, and the court entrusted by statute with authority to review the agency's decision, would be incapable of implementing their statutory duties by fashioning effective relief. Thus invocation of the All Writs Act, as a preservative of jurisdiction, was considered appropriate.

Neither the reviewing jurisdiction of the Civil Service Commission nor that of the District Court would be similarly frustrated by a decision of the District Court remitting respondent to her administrative remedy. Certainly the Civil Service Commission will be able to weigh respondent's contentions and to order necessary relief without the aid of the District Court injunction. In direct contrast to the claim of the FTC in *Dean Foods* that its jurisdiction would be effectively defeated by

power to ask the courts of appeals to exercise their authority derived from the All Writs Act." 384 U. S., at 606.

A contrary decision, the Court felt, would have made it virtually impossible for the Commission itself to undertake review of the proposed merger. The congressional grant of authority to the FTC in Clayton Act cases thus could have been frustrated.

[34] *Id.*, at 599–600. The complaint charged that one of the parties to the merger " 'as an entity will no longer exist,' " *id.*, at 599, and that "consummation of the agreement would 'prevent the Commission from devising, or render it extremely difficult for the Commission to devise, any effective remedy after its decision on the merits.' " *Id.*, at 600. The Commission therefore was affirmatively asserting that the administrative remedy which it was authorized to fashion was inadequate.

[35] *Id.*, at 601.

denial of relief, the Commission here has argued that judicial action interferes with .the normal agency processes.[36]   And we see nothing in the record to suggest that any judicial review available under the doctrine of *Service* v. *Dulles* would be defeated in the same manner as review in *Dean Foods*.

We are therefore unpersuaded that the temporary injunction granted by the District Court in this case was justified either by our prior decisions dealing with the availability of injunctive relief to discharged federal employees, or by those dealing with the authority of reviewing courts to grant temporary stays or injunctions pending full appellate review.   If the order of the District Court in this case is to be upheld, the authority must be found elsewhere.

## III

This Court observed in *Scripps-Howard* that "[t]he search for significance in the silence of Congress is too often the pursuit of a mirage," 316 U. S., at 11, and this observation carries particular force when a statutory scheme grants broad regulatory latitude to an administrative agency.   In *Scripps-Howard* a careful review of the relevant statutory provisions and legislative history persuaded this Court that Congress had not intended to nullify the power of an appellate court,[37] having assumed jurisdiction after an agency decision, to issue stays in aid of its jurisdiction.   The Court noted, in

---

[36] In *Dean Foods* the Commission confessed its inability to fashion effective administrative relief.   But petitioners here admit no such thing.   Rather they strongly assert that the Back Pay Act, n. 31, *supra,* provides a complete remedy for any procedural irregularities which may have occurred in this case.

[37] 316 U. S., at 11–13.

particular, that stays were allowed in other cases proc-
essed through the FCC [38] and that the Court of Appeals
had routinely issued stays in similar cases before under-
taking an unexpected shift in policy.[39]   But, at the other
end of the spectrum, in *Arrow  Transportation  Co.* v.
*Southern R. Co.,* 372 U. S. 658 (1963), this Court held
that a specific congressional grant of power to the ICC
to suspend proposed rate modifications precluded the
District Court from extending the suspension by tem-
porary injunction.   This was true despite arguments
that district courts traditionally had such power and
that Congress did not explicitly revoke the power by
statute.[40]   The Court there said:

> "The  more  plausible  inference  is  that  Congress
> meant  to  foreclose  a  judicial  power  to  interfere
> with  the  *timing*  of  rate  changes  which  would  be

[38] The Court compared the provisions of §§ 402 (a) and 402 (b)
of the Communications Act of 1934, 48 Stat. 1064.  The former
section specifically authorized temporary stays, through application
of the Urgent Deficiencies Appropriation Act of Oct. 22, 1913, 38
Stat. 208, of orders of the Federal Communications Commission
which were under review—with certain exceptions.  Those excep-
tions, which included the order there at issue, were treated under
§ 402 (b) which made no specific provision for such stays.  The
Court thus was required to consider whether Congress deliberately
sought to deprive courts of a power in those cases not governed
by the Urgent Deficiencies Act which had been expressly authorized
for those cases which were governed by the Act.

[39] See n. 24, *supra.*

[40] Although acknowledging that the legislative history did not
clearly establish "a design to extinguish whatever judicial power
may have existed prior to 1910 to suspend proposed rates," the
Court concluded: "[W]e cannot suppose that Congress, by vesting
the new suspension power in the Commission, intended to give back-
handed approval to the exercise of a judicial power which had
brought the whole problem to a head."  372 U. S., at 664.

out of harmony with the uniformity of rate *levels* fostered by the doctrine of primary jurisdiction." [41]

The overall scheme governing employees of the Federal Government falls neatly within neither of these precedents. Unlike *Scripps-Howard,* traditional stay practice lends little support to the sort of relief which the District Court granted respondent here, and the precedents dealing with the availability of equitable relief to discharged Government employees are quite unfavorable to respondent. Unlike *Arrow Transportation, supra,* the administrative structure is far more a creature of agency regulations than of statute. We are thus not prepared to conclude that Congress in this class of cases has wholly divested the district courts of their customary authority to grant temporary injunctive relief, and to that extent we agree with the Court of Appeals. But merely because the factors relied upon by the Government do not establish that the district courts are wholly bereft of the authority claimed for them here does not mean, as the Court of Appeals appeared to believe, that temporary injunctive relief in this class of cases is to be dispensed without regard to those factors. While considerations similar to those found sufficient in *Arrow Transportation* to totally deprive the district courts of equitable authority do not have that force here, they nonetheless are entitled to great weight in the equitable balancing process which attends the grant of injunctive relief.

We are dealing in this case not with a permanent Government employee, a class for which Congress has specified certain substantive and procedural protections,[42] but with a probationary employee, a class which Con-

---

[41] *Id.,* at 668. (Emphasis in original.)

[42] See 5 U. S. C. § 7501.

gress has specifically recognized as entitled to less comprehensive procedures. Title 5 U. S. C. § 3321, derived from the original Pendleton Act,[43] requires the creation of this classification:

> "The President may prescribe rules, which shall provide, as nearly as conditions of good administration warrant, that there shall be a period of probation before an appointment in the competitive service becomes absolute."

It is also clear from other provisions in the Civil Service statutory framework that Congress expected probationary employees to have fewer procedural rights than permanent employees in the competitive service. For example, preference eligibles,[44] commonly veterans, are entitled to hearing procedures extended to persons in the competitive service *only after they have completed* "a probationary or trial period."[45] Persons suspended for national security reasons are given expanded protection *provided they have completed a trial or probationary period.*[46]

The Civil Service regulations are consistent with these statutes. These regulations are promulgated by the Civil Service Commission as authorized by Congress in

---

[43] 22 Stat. 404.

[44] See 5 U. S. C. § 2108 (3).

[45] 5 U. S. C. §§ 7511–7512. Section 7511 defines a "preference eligible employee" as "a permanent or indefinite preference eligible who has completed a probationary or trial period as an employee of an Executive agency or as an individual employed by the government of the District of Columbia . . . ," subject to certain exceptions. Section 7512 provides that such an employee must receive written notice of the reasons for proposed adverse action, a chance to reply in writing and by affidavit, and notice of an adverse decision. A probationary employee, under the regulations, has more limited rights. See 5 CFR § 315.801 *et seq.*

[46] 5 U. S. C. § 7532 (c) (2).

5 U. S. C. §§ 1301–1302.[47]   Part 752, the regulations governing adverse agency actions, provides certain procedural safeguards for employees but, as did the statutes cited above, exempts "employee[s] currently serving a probationary or trial period."[48]   Such employees are remitted to the procedures specified in subpart H of Part 315,[49] the procedures at issue here.   Under § 752.202 of the regulations permanent competitive service employees are to be retained in an active-duty status only during the required 30-day-notice period, and the Commission is given no authority to issue additional stays.[50] It cannot prevent the dismissal of an employee or order his reinstatement prior to hearing and determining his appeal on the merits.   Reasonably, a probationary employee could be entitled to no more than retention on active duty for the period preceding the effective date of his discharge.

Congress has also provided a broad remedy for cases of improper suspension or dismissal.   The Back Pay Act of 1948[51] supplemented the basic Lloyd-LaFollette Act

---

[47] Title 5 U. S. C. § 3301 *et seq.* grants to the President authority to promulgate rules and regulations governing the Civil Service. Title 5 U. S. C. § 1301 provides that "[t]he Civil Service Commission shall aid the President, as he may request, in preparing the rules he prescribes under this title for the administration of the competitive service."   Title 5 U. S. C. § 1302 empowers the Commission to prescribe regulations, "subject to the rules prescribed by the President . . . ."

[48] 5 CFR § 752.103 (a)(5).

[49] 5 CFR § 315.801 *et seq.*

[50] Title 5 CFR § 752.202 (d) reads in part:

"Except as provided in paragraph (e) of this section, an employee against whom adverse action is proposed is entitled to be retained in an active duty status during the notice period."

Section 752.202 (a)(1) provides that "at least 30 full days' advance written notice" is required.

[51] See n. 31. *supra.*

of 1912 and provided that any person in the competitive Civil Service who was unjustifiably discharged and later restored to his position was entitled to full backpay for the time he was out of work. The benefits of this Act were extended to additional employees, including probationary employees, in 1966.[52] Respondent was eligible for full compensation for any period of improper discharge under this section.

As we have noted, respondent's only substantive claim, either before the District Court or in her administrative appeal, was that petitioners had violated the regulations promulgated by the Civil Service Commission. Those same regulations provided for an appeal to the agency which promulgated the regulations and further provided that until that appeal had been heard on the merits, the employer's discharge of the employee was to remain in effect. Respondent, however, sought judicial intervention before fully utilizing the administrative scheme.

The District Court, exercising its equitable powers, is bound to give serious weight to the obviously disruptive effect which the grant of the temporary relief awarded here was likely to have on the administrative process. When we couple with this consideration the historical denial of all equitable relief by the federal courts in cases such as *White* v. *Berry*, 171 U. S. 366 (1898), the well-established rule that the Government has traditionally been granted the widest latitude in the "dispatch of its own internal affairs," *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 896 (1961), and the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee, 5A A. Corbin, Contracts § 1204 (1964), we think that the Court of Appeals was quite wrong in routinely applying to this case the traditional

---

[52] 80 Stat. 94, 95.

standards governing more orthodox "stays." See *Virginia Petroleum Jobbers Assn.* v. *FPC,* 104 U. S. App. D. C. 106, 259 F. 2d 921 (1958).[53] Although we do not hold that Congress has wholly foreclosed the granting of preliminary injunctive relief in such cases, we do believe that respondent at the very least must make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases. We now turn to the showing made to the District Court on that issue, and to the Court of Appeals' treatment of it.

## IV

The Court of Appeals said in its opinion:

"Without passing on the merits of Mrs. Murray's contention that she will suffer irreparable harm if the sought-for-relief is not granted (a task for the District Court here), we note that there was a determination that such a loss of employment could be 'irreparable harm' in Reeber v. Rossell (1950), a case quite similar to that at bar. We agree with the *Reeber* court that such a loss of employment *can* amount to irreparable harm, and that injunctive relief *may* be a proper remedy pending the final administrative determination of the validity of the discharge by the Civil Service Commission." [54]

---

[53] These considerations were set forth by the majority below as follows:

"(1) Has the petitioner made a strong showing that he is likely to prevail on the merits of his appeal? (2) Has the petitioner shown that without such relief he will be irreparably injured? (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? (4) Where lies the public interest?" 149 U. S. App. D. C., at 263, 462 F. 2d, at 878.

[54] *Id.,* at 262, 462 F. 2d, at 877 (emphasis in original).

At another point in its opinion, the Court of Appeals said:

> "As the District Court here felt that the hearing on the motion for the preliminary injunction could not be completed until Mr. Sanders was produced to testify, it was proper for him to continue the stay, in order to preserve the *status quo* pending the completion of the hearing." [55]

The court in its supplemental opinion filed after the Government's petition for rehearing further expanded its view of this aspect of the case:

> "The court's opinion does not hold, and the trial judge has not yet held, that interim relief *is proper* in Mrs. Murray's case, but we do hold that the trial judge may consider granting such relief, as this is inherent in his historical equitable role." [56]

In form the order entered by the District Court now before us is a continuation of the temporary restraining order originally issued by that court.[57] It is clear from the Court of Appeals' opinion that that court so construed it. But since the order finally settled upon by the District Court was in no way limited in time, the provisions of Fed. Rule Civ. Proc. 65 come into play. That Rule states, in part:

> "(b) A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before

---

[55] *Id.*, at 265, 462 F. 2d, at 880.

[56] *Id.*, at 270, 462 F. 2d, at 885 (emphasis in original).

[57] See n. 8, *supra.*

the adverse party or his attorney can be heard in opposition . . . . Every temporary restraining order granted without notice . . . shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period."

The Court of Appeals whose judgment we are reviewing has held that a temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must conform to the standards applicable to preliminary injunctions. *National Mediation Board* v. *Airline Pilots Assn.*, 116 U. S. App. D. C. 300, 323 F. 2d 305 (1963). We believe that this analysis is correct, at least in the type of situation presented here, and comports with general principles imposing strict limitations on the scope of temporary restraining orders.[58]  A dis-

---

[58] The Court of Appeals for the Second Circuit, in an opinion cited by the Court of Appeals for the District of Columbia Circuit in *National Mediation Board* v. *Airline Pilots Assn.*, 116 U. S. App. D. C. 300, 323 F. 2d 305 (1963), described these principles as follows:

"It is because the remedy is so drastic and may have such adverse consequences that the authority to issue temporary restraining orders is carefully hedged in Rule 65 (b) by protective provisions. And the most important of these protective provisions is the limitation on the time during which such an order can continue to be effective.

"It is for the same reason, the possibility of drastic consequences which cannot later be corrected, that an exception is made to the

trict court, if it were able to shield its orders from appellate review merely by designating them as temporary restraining orders, rather than as preliminary injunctions, would have virtually unlimited authority over the parties in an injunctive proceeding. In this case, where an adversary hearing has been held, and the court's basis for issuing the order strongly challenged, classification of the potentially unlimited order as a temporary restraining order seems particularly unjustified. Therefore we

---

final judgment rule to permit review of preliminary injunctions. 28 U. S. C. § 1292 (a)(1). To deny review of an order that has all the potential danger of a preliminary injunction in terms of duration, because it is issued *without* a preliminary adjudication of the basic rights involved, would completely defeat the purpose of this provision.

"We hold, therefore, that the continuation of the temporary restraining order beyond the period of statutory authorization, having, as it does, the same practical effect as the issuance of a preliminary injunction, is appealable within the meaning and intent of 28 U. S. C. § 1292 (a)(1)." *Pan American World Airways* v. *Flight Engineers' Assn.*, 306 F. 2d 840, 843 (1962). (Citations omitted; emphasis in original.)

Our Brother MARSHALL, in his dissenting opinion, nevertheless suggests that a district court can totally or partially impede review of an indefinite injunctive order by failing to make any findings of fact or conclusions of law. It would seem to be a consequence of this reasoning that an order which neglects to comply with one rule may be saved from the normal appellate review by its failure to comply with still another rule. We do not find this logic convincing. Admittedly, the District Court did not comply with Fed. Rule Civ. Proc. 52 (a), but we do not think that we are thereby foreclosed from examining the record to determine if sufficient allegations or sufficient evidence supports the issuance of injunctive relief. As discussed below, nothing in the pleadings or affidavits, or in the testimony at the hearing before the District Court, demonstrates that this is an extraordinary case supporting the award of judicial relief. See n. 68, *infra*.

view the order at issue here as a preliminary injunction.

We believe that the Court of Appeals was quite wrong in suggesting that at this stage of the proceeding the District Court need not have concluded that there was actually irreparable injury.[59] This Court has stated that "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies," *Beacon Theatres, Inc.* v. *Westover,* 359 U. S. 500, 506–507 (1959), and the Court of Appeals itself in *Virginia Petroleum Jobbers Assn.* v. *FPC,* 104 U. S. App. D. C. 106, 259 F. 2d 921 (1958), has recognized as much. Yet the record before us indicates that no witnesses were heard on the issue of irreparable injury, that respondent's complaint was not verified, and that the affidavit she submitted to the District Court did not touch in any way upon considerations relevant to irreparable injury.[60] We are therefore somewhat puzzled

---

[59] We note that Rule 65 requires a showing of irreparable injury for the issuance of a temporary restraining order as well. Therefore, for the purposes of this part of the discussion, it would make no difference that the order was styled a temporary restraining order, rather than a preliminary injunction.

[60] The affidavit in its entirety states:

"JEANNE M. MURRAY, being first duly sworn, deposes as follows:

"1. I am presently employed by the Public Buildings Service of the General Services Administration (GSA) as a Program Analyst, GS–13.

"2. On May 20, 1971, at approximately five p. m., I was given a letter signed by Mr. W. H. Sanders, Acting Commissioner of the Public Buildings Service, informing me that my employment was to be terminated as of Saturday, May 29, 1971.

"3. I have never been told that GSA's Personnel files contain adverse information about my service in the Defense Intelligence Agency (DIA), nor have I ever seen a memorandum dealing with my employment there.

"4. I worked for slightly over a year at the DIA, and I have been

about the basis for the District Court's conclusion that respondent "may suffer immediate and irreparable injury." The Government has not specifically urged this procedural issue here, however, and the Court of Appeals in its opinion discussed the elements upon which it held that the District Court might base a conclusion of irreparable injury. Respondent's unverified complaint alleged that she might be deprived of her income for an indefinite period of time, that spurious and unrebutted charges against her might remain on the record, and that she would suffer the embarrassment of being wrongfully discharged in the presence of her coworkers.[61] The Court of Appeals intimated that either loss of earnings or damage to reputation might afford a basis for a finding of irreparable injury and provide a basis for temporary injunctive relief.[62] We disagree.[63]

---

informed by the Acting Chief of Staff of the DIA, Rear Admiral D. E. Bergin, that my personnel file at DIA contains nothing derogatory to me.

"5. In recent weeks, I was informed by Mr. William Mulroney, a DIA employee, that someone from GSA had been making inquiries of DIA personnel about my term of service there."

[61] Complaint, par. 12.

[62] 149 U. S. App. D. C., at 262, 462 F. 2d, at 877.

[63] The Court of Appeals held that the Government's failure to produce witness Sanders, after the District Court chose to hear him orally, rather than to rely on his affidavit, allowed the District Court to continue the temporary restraining order until Sanders appeared. We have no doubt that a district court in appropriate circumstances may be justified in resolving against a party refusing to produce a witness under his control the relevant issues upon which that witness' testimony might have touched. But it is clear from the record that the testimony of the witness Sanders was desired to test the basis upon which respondent was discharged, testimony which, of course, would go to the issue of respondent's ultimate chances for success on the merits. While the District Court may

Even under the traditional standards of *Virginia Petroleum Jobbers, supra,* it seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.[64]  In that case the court stated:

"The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."[65]

This premise is fortified by the Back Pay Act discussed above.[66]  This Act not only affords monetary relief which will prevent the loss of earnings on a periodic basis from being "irreparable injury" in this type of case, but

---

well have been entitled to resolve *that* issue against the Government at that stage of the proceeding, this conclusion in no way dispenses with the necessity for a conclusion that irreparable injury will occur, since that is a separate issue that must be proved to the satisfaction of the Court by the person seeking equitable relief.

[64] It should be noted that *Virginia Petroleum Jobbers* dealt with a fact situation quite dissimilar to this one.  There the Federal Power Commission had denied petitioner leave to intervene in proceedings before the Commission.  In conjunction with appeal of that decision the petitioner had filed a "motion for a stay of further proceedings pending completion of [the Court's] review of the Commission's orders denying intervention or rehearing."  104 U. S. App. D. C., at 109, 259 F. 2d, at 924.  Such a fact situation was far closer to the traditional situation in which equity powers have been employed to grant a stay pending appeal than is the situation involved in the instant case.

[65] *Id.,* at 110, 259 F. 2d, at 925 (emphasis in original).

[66] N. 31, *supra.*

its legislative history suggests that Congress contemplated that it would be the usual, if not the exclusive, remedy for wrongful discharge. The manager of the bill on the floor of the Senate, Senator Langer, commented on the bill at the time of its passage:

> "[It] . . . provides that an agency or department of the Government may remove any employee at any time, but that the employee shall then have a right of appeal. When he is removed, he is of course off the pay roll. If he wins the appeal, it is provided that he shall be paid for the time during which he was suspended." [67]

Respondent's complaint also alleges, as a basis for relief, the humiliation and damage to her reputation which may ensue. As a matter of first impression it would seem that no significant loss of reputation would be inflicted by procedural irregularities in effectuating respondent's discharge, and that whatever damage might occur would be fully corrected by an administrative determination requiring the agency to conform to the applicable regulations. Respondent's claim here is not that she could not as a matter of statutory or administrative right be discharged, but only that she was entitled to additional procedural safeguards in effectuating the discharge.

Assuming for the purpose of discussion that respondent had made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the

---

[67] 94 Cong. Rec. 6681 (1948).

issuance of a temporary injunction in this type of case.[68] We therefore reverse the decision of the Court of Appeals which approved the action of the District Court.

*It is so ordered.*

MR. JUSTICE DOUGLAS, dissenting.

I think with all respect that while the narrow isolated issue involved in this litigation is exposed in the opinion of the Court the nature of the problem is not.

Respondent, a probationary employee, claims that her discharge was not based exclusively on her work as a probationary employee. If it were based on her work as a probationary employee, the procedure is quite summary and her right of appeal to the Civil Service Commission is limited to only a few grounds such as discrimination based on race, color, religion, sex, or national origin, 5 CFR § 315.806. But her claim is that her discharge was based, at least in part, on conduct prior to her federal employment. In case that prior conduct is the basis of the discharge, the employee is entitled to advance notice of proposed termination, an oppor-

---

[68] We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual. But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation. Use of the court's injunctive power, however, when discharge of probationary employees is an issue, should be reserved for that situation rather than employed in the routine case. See also *Wettre* v. *Hague*, 74 F. Supp. 396 (Mass. 1947); vacated and remanded on other grounds, 168 F. 2d 825 (CA1 1948).

tunity to respond in writing with supporting affidavits, and notice of any adverse decisions on or prior to the effective date of the termination, 5 CFR § 315.805.

The Congress in 1966 provided that all wrongfully discharged federal employees, including probationary employees are entitled to backpay, 5 U. S. C. § 5596, and the Court concludes that that is the employee's exclusive remedy.

But where an agency has terminated employment and the employee appeals to the Civil Service Commission, the Commission has no power to issue a stay of the agency's action.   This is, therefore, not a case where the employee has gone to the courts for relief which the Commission could have granted but refused to do so. Nor is respondent challenging the Civil Service law; nor is she asking for a ruling on the merits of her claim; nor did the District Court, whose judgment was affirmed by the Court of Appeals, act in derogation of the administrative process.   Rather, it protected that process by staying the discharge until the Commission had ruled on the appeal.

The power to issue a stay is inherent in judicial power and as indicated by the Court rests on the exercise of an informed discretion on a showing of irreparable injury to the applicant or to the public interest, *Scripps-Howard Radio* v. *FCC*, 316 U. S. 4, 14.   That doctrine is not limited, as the Department of Justice suggests, to issuance of stays by a court only after an appeal has been taken.   We held in *FTC* v. *Dean Foods Co.*, 384 U. S. 597, 603–604, that the All Writs Act, 28 U. S. C. § 1651, which empowers federal courts to " 'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law,' " extends to "potential jurisdiction of the appellate court where an

appeal is not then pending but may be later perfected." The District Court has at least a limited review of the Commission, *Norton* v. *Macy,* 135 U. S. App. D. C. 214, 217, 417 F. 2d 1161, 1164; *Dozier* v. *United States,* 473 F. 2d 866. Hence the All Writs Act justified its power to grant a stay.

We have, therefore, a case where a stay supplements and does not curtail administrative power, the Commission having no authority to grant that relief. The District Court power preserves the status quo, does not pass on the merits of the controversy, and limits its stay to the date when the merits of the discharge are adjudicated by the Commission. I agree with the Court that that order was appealable.

A point is made that respondent has not shown irreparable injury. That misstates the issue. The Distric Court issued a stay pending a hearing on whether a temporary injunction should issue. The hearing, if held, would encompass two issues: (1) whether the grounds for respondent's discharge antedated her present employment (see 149 U. S. App. D. C. 256, 269, 462 F. 2d 871, 884) and were not restricted to her record as a probationary employee; [1] and (2) whether she would suffer irreparable injury. As stated by the Court of Appeals, respondent "may show . . . irreparable damage, if the hearing before Judge Gasch is allowed to proceed to a decision." *Id.,* at 269, 462 F. 2d, at 884. The stay was issued by the District Court only because the federal

---

[1] Where, as here, conduct prior to appointment as a probationary employee as well as conduct during the period of employment is alleged to be the basis of the discharge, the requirements of procedural due process are obvious. We said in *Wieman* v. *Updegraff,* 344 U. S. 183, 192, "It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory." And see *Schwartz* v. *Covington,* 341 F. 2d 537, 538.

agency involved refused to produce as a witness the officer who had decided to discharge respondent. Both the District Court and the Court of Appeals were alert to the necessity to show irreparable injury before an injunction issues.

On that issue there is more than meets the eye.

Employability is the greatest asset most people have. Once there is a discharge from a prestigious federal agency, dismissal may be a badge that bars the employee from other federal employment. The shadow of that discharge is cast over the area where private employment may be available. And the harm is not eliminated by the possibility of reinstatement, for in many cases the ultimate absolution never catches up with the stigma of the accusation. Thus the court in *Schwartz* v. *Covington,* 341 F. 2d 537, 538, issued a stay upon a finding of irreparable injury where a serviceman was to be discharged for alleged homosexual activity: "[A]ppellee has shown that he will suffer irreparable damage if the stay is not granted. Irrespective of the government's recent assurance that the appellee would be reinstated if he prevails upon review of his discharge, the injury and the stigma attached to an undesirable discharge are clear." Unlike a layoff or discharge due to fortuitous circumstances such as the so-called energy crisis, a discharge on the basis of an employee's lifetime record or on the basis of captious or discriminatory attitudes of a superior may be a cross to carry the rest of an employee's life. And we cannot denigrate the importance of one's social standing or the status of social stigma as legally recognized harm. In *Ah Kow* v. *Nuan,* 5 Sawy. 552, the Circuit Court, speaking through Mr. Justice Field, held that a Chinese prisoner could recover damages from the sheriff who cut off his queue, the injury causing great mental anguish, disgrace

in the eyes of friends and relatives, and ostracism from association with members of his own race.

There is no frontier where the employee may go to get a new start. We live today in a society that is closely monitored. All of our important acts, our set-backs, the accusations made against us go into data banks and are instantly retrievable by the computer.[2] An arrest goes into the data bank even though it turns out to be unconstitutional or based on mistaken identity. There is no federal procedure for erasing arrests. While they arise in 50 States as well as in the federal area, only a few States have procedures for erasing them; and that entails a long and laborious procedure.[3] More-

---

[2] With dossiers being compiled by commercial credit bureaus, state and local law enforcement agencies, the CIA, the FBI, the IRS, the Armed Services, and the Census Bureau, we live in an Orwellian age in which the computer has become "the heart of a surveillance system that will turn society into a transparent world." Miller, Computers, Data Banks and Individual Privacy: An Overview, 4 Col. Human Rights L. Rev. 1, 2 (1972). Although the subject of congressional concern, the problem is one which has thus far avoided legislative correction. See Federal Data Banks, Computers and the Bill of Rights, Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 92d Cong., 1st Sess. (1971). See also A. Miller, The Assault on Privacy (1971).

[3] Illinois provides that photographs, fingerprints, etc., be returned to unconvicted arrestees upon acquittal or release and further provides that the arrestee may petition a local court to have the record expunged by the arresting authorities. There is, however, no method for retrieving records which have been distributed to other law enforcement authorities or to private individuals. Ill. Rev. Stat., c. 38, § 206–5 (1973). Connecticut has a statute with similar short-comings. Conn. Gen. Stat. Ann. § 54–90 (Supp. 1971); see Satter & Kalom, False Arrest: Compensation and Deterrence, 43 Conn. B. J. 598, 612–613. New York's former Penal Law provided that all fingerprints, photographs, etc., of those acquitted of criminal charges had to be returned to the individual *if* no other criminal proceedings were pending against the individual and he had no prior convictions. N. Y. Penal Law § 516 (1909).

over, this generation grew up in the age where millions of people were screened for "loyalty" and "security"; and many were discharged from the federal service; many resigned rather than face the ordeal of the "witch hunt" that was laid upon them. Discharge from the federal service or resignation under fire became telltale signs of undesirability. Therefore, the case of irreparable injury for an unexplained discharge from federal employment may be plain enough on a hearing.

The District Court and the Court of Appeals were well within the limits of the law in granting a stay so that the issue of irreparable injury might be determined. It hardly comports with any standard for the expenditure of judicial energies to spend our time trying to find error in the exercise of the lower court's discretion to protect federal employees by giving them at least a chance to prove irreparable injury.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN concurs, dissenting.

In my view no appealable order has been entered in this case, and both the Court of Appeals and this Court accordingly lack jurisdiction.

The orders issued by the District Court are both temporary restraining orders. The first, issued on May 28 and captioned "Temporary Restraining Order," enjoined Mrs. Murray's dismissal until the determination of her application for an injunction. The second, issued on June 4 and also captioned "Temporary Restraining Order," provides "that the Temporary Restraining Order issued by this Court at twelve o'clock p. m., May 28, 1971, is continued until the appearance of the aforesaid W. H. Sanders." At no time did the District Court indicate it was issuing anything but a temporary restraining order. During the hearing on the application for a preliminary injunction, after the court indicated

it wanted to hear from Mr. Sanders in person, the Government informed the court that Mr. Sanders was then out of town on vacation. The court replied: "Let me know when he can be available." Counsel for the Government responded: "Very well." And the District Court then said: "The T. R. O. will be continued until he shows up. . . . Tell the agency I will continue the temporary restraining order until the witness appears." Tr. 10.

It is well settled that the grant or denial of a temporary restraining order is not appealable, except in extraordinary circumstances, not present here, where the denial of the temporary restraining order actually decides the merits of the case or is equivalent to a dismissal of the suit. See generally 11 C. Wright & A. Miller, Federal Practice & Procedure § 2962, pp. 616–617 (1973), and cases there cited.

The Court holds, however, that since the temporary restraining order was extended by the District Court beyond the time limitation imposed by Fed. Rule Civ. Proc. 65 (b), it became an appealable preliminary injunction. I cannot agree. Federal Rule Civ. Proc. 52 (a) expressly provides that "in granting or refusing interlocutory injunctions the court shall . . . set forth the findings of fact and conclusions of law which constitute the grounds of its action." This Rule applies to preliminary injunctions, and as no findings of fact and conclusions of law have yet been filed in this case, no valid preliminary injunction was ever issued. See *National Mediation Board* v. *Air Line Pilots Assn.*, 116 U. S. App. D. C. 300, 323 F. 2d 305 (1963); *Sims* v. *Greene*, 160 F. 2d 512 (CA3 1947).

Nor would it make sense for this Court to review the District Court's order in this case as the grant of a preliminary injunction. Where the District Court has not entered findings of fact and conclusions of law under

Rule 52 (a), meaningful review is well-nigh impossible. "It is of the highest importance to a proper review of the action of a court in granting or refusing a preliminary injunction that there should be fair compliance with Rule 52 (a) of the Rules of Civil Procedure." *Mayo* v. *Lakeland Highlands Canning Co.*, 309 U. S. 310, 316 (1940).

It is suggested that if an indefinitely extended temporary restraining order remained unappealable, the District Court would have virtually unlimited authority over the parties in an injunctive action. At the outset, this cannot justify this Court's reaching the merits of Mrs. Murray's claim for a preliminary injunction. Even if the order entered by the District Court is appealable, it should be appealable only for the purposes of holding it invalid for failure to comply with Rule 52 (a). This was the precise course taken by the Court of Appeals for the District of Columbia Circuit in *National Mediation Board, supra,* on which the majority relies. See also *Sims* v. *Greene, supra.*

In addition, the Government had other courses it could have taken in this case. In view of the District Court's error in granting a restraining order of unlimited duration without complying with the requirements for a preliminary injunction, the Government could have moved the District Court to dissolve its order indefinitely continuing the temporary restraining order. Rule 65 (b) expressly provides for such a motion.[1] Had the Government followed this course, the District Court could have

---

[1] "On 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require." Fed. Rule Civ. Proc. 65 (b).

corrected its error and gone on to resolve the issues presented by the application for a preliminary injunction. The end result would have been the grant or denial of a preliminary injunction, with findings of fact and conclusions of law, which we could meaningfully review.

Here, instead, we find the Supreme Court determining that although the District Court had jurisdiction to grant injunctive relief, the equities of Mrs. Murray's case did not support a preliminary injunction, when neither the District Court nor the Court of Appeals has yet confronted the latter issue.[2] I do not believe this makes for sound law.

Since the majority persists in considering the merits of Mrs. Murray's claim for injunctive relief, some additional comment is in order. I agree with the majority's conclusion that Congress did not divest federal courts of their long-exercised authority to issue temporary injunctive relief pending the exhaustion of both administrative and judicial review of an employee's claim of wrongful dismissal. I cannot accept, however, the way in which the majority opinion then proceeds to take away with the left hand what it has just given with the right, by precluding injunctive relief in all but so-called "extraordinary cases," whatever they may be.

At the outset, I see no basis for applying any different standards for granting equitable relief in the context of a discharged probationary employee than the long-recognized principles of equity applied in all other situations. See *Virginia Petroleum Jobbers Assn.* v. *FPC*, 104 U. S. App. D. C. 106, 259 F. 2d 921 (1958). Indeed, it appears that the factors which the

---

[2] The Court of Appeals expressly stated that it was not evaluating Mrs. Murray's claim of irreparable injury because "any such finding . . . is for the trial judge, who has not yet [decided (and may never decide)] this point in favor of Mrs. Murray." 149 U. S. App. D. C. 256, 262 n. 21, 462 F. 2d 871, 877 n. 21 (1972).

majority would have courts weigh before granting injunctive relief are all encompassed within the traditional formulations. The adequacy of backpay as a remedy, for example, is relevant in determining whether the party seeking relief has shown that "without such relief, it will be irreparably injured." *Id.*, at 110, 259 F. 2d, at 925. Likewise, the possible disruptive effect which temporary injunctive relief might have on the office where respondent was employed or on the administrative review process itself relates to whether "the issuance of a stay [will] substantially harm other parties interested in the proceedings." *Ibid.*

However one articulates the standards for granting temporary injunctive relief, I take it to be well settled that a prerequisite for such relief is a demonstrated likelihood of irreparable injury for which there is no adequate legal remedy. But I cannot accept the majority's apparent holding, buried deep in a footnote, that because of the Back Pay Act, a temporary loss in income can never support a finding of irreparable injury, no matter how severely it may affect a particular individual. See *ante*, at 92 n. 68. Many employees may lack substantial savings, and a loss of income for more than a few weeks' time might seriously impair their ability to provide themselves with the essentials of life—*e. g.*, to buy food, meet mortgage or rent payments, or procure medical services. Cf. *Goldberg* v. *Kelly*, 397 U. S. 254, 264 (1970). Government employees might have skills not readily marketable outside the Government, making it difficult for them to find temporary employment elsewhere to tide themselves over until the lawfulness of their dismissal is finally determined. In some instances, the likelihood of finding alternative employment may be further reduced by the presence on the employee's records of the very dismissal at issue. Moreover, few employers will be willing to hire and train a new employee knowing

he will return to his former Government position if his appeal is successful. Finally, the loss of income may be "temporary" in only the broadest sense of that word. Not infrequently, dismissed federal employees must wait several years before the wrongful nature of their dismissal is finally settled and their right to backpay established. See, *e. g., Paroczay* v. *United States,* 177 Ct. Cl. 754, 369 F. 2d 720 (1966); *Paterson* v. *United States,* 162 Ct. Cl. 675, 319 F. 2d 882 (1963).

The availability of a backpay award several years after a dismissal is scant justice for a Government employee who may have long since been evicted from his home and found himself forced to resort to public assistance in order to support his family. And it is little solace to those who are so injured to be told that their plight is "normal" and "routine." Whether common or not, such consequences amount to irreparable injury which a court of equity has power to prevent.

Nor can I agree with the majority's analysis of Mrs. Murray's claim of damaged reputation. It is argued that Mrs. Murray can suffer no significant loss of reputation by procedural irregularities in effectuating her discharge because her claim is not that she could not as a matter of statutory or administrative right be discharged, but only that she was entitled to additional procedural safeguards in effectuating the discharge. *Ante,* at 91. In my view, this analysis not only reflects a total misunderstanding of the gist of Mrs. Murray's complaint, but also fails to comprehend the purposes behind the Civil Service Commission regulations at issue here.

The Commission provides a special pretermination procedure where a probationary employee is to be terminated "for conditions arising before appointment," not as an empty gesture, but rather because the employing agency might be mistaken about these preappointment conditions, and might decide not to dismiss the employee

if he is given an opportunity to present his side of the story. Mrs. Murray does not seek a hearing as an end in itself, but rather to correct what she believes is a mistaken impression the agency had about her conduct in her prior job, in the hope that with the record straight, the agency would not discharge her. She seeks to save her job and to avoid the blot on her employment record that a dismissal entails, and it is in this sense that she claims her dismissal would injure her reputation.

Whether the likelihood of irreparable injury to Mrs. Murray if she is not allowed to retain her job pending her administrative appeal, when balanced against the Government's interests in having her out of the office during this period, supports equitable relief in the present case is a question I would leave for the District Court. Because of Mr. Sanders' absence, the District Court cut short its hearing on the application for a preliminary injunction before either the Government or Mrs. Murray had an opportunity to present witnesses or other evidence. Mrs. Murray still has not had her day in court to present evidence supporting her allegation of irreparable injury, and what that evidence would be were she given that opportunity we can only speculate.